## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**IN RE:  BENNY R. POWELL**
**AND TAMMY J. POWELL, Debtors**                    **No. 4:16-bk-14307**
                                                                          **Chapter 7**


**HAROLD GLENN CALDWELL**                    **PLAINTIFF AND**
                                                                    **COUNTERDEFENDANT**


**and**


**CALDWELL-POWELL CONSTRUCTION, LLC**                    **PLAINTIFF**


**v.**                    **4:16-ap-1161**


**BENNY R. POWELL AND**                    **DEFENDANTS AND**
**TAMMY J. POWELL**                    **COUNTERCLAIMANTS**


### OPINION AND ORDER DENYING DEBTORS' CHAPTER 7 DISCHARGE

On November 28, 2016, Harold Glenn Caldwell [Caldwell], individually and on behalf of

Caldwell-Powell Construction, LLC [CPC], filed the above-captioned complaint against

the debtors, Benny and Tammy Powell.  In his complaint, Caldwell asks the Court to

determine the amount of the debts that he alleges joint debtor Benny Powell [Powell]

owes to both Caldwell and CPC.  Caldwell also seeks a determination that the debts in

question are nondischargeable under 11 U.S.C. § 523(a)(4).  Alternatively, Caldwell

objects to the chapter 7 discharge of both Powell and his wife, Tammy[1] [together

---

[1]  The Court respectfully references Tammy Powell by her first name to
distinguish her from Powell with minimal confusion.

referenced as the debtors], pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A).[2]  On December 29, 2016, the debtors filed an answer and counterclaim, arguing that they are entitled to discharge their debts, including those allegedly owed to Caldwell and CPC. The debtors also assert that, to the extent the Court determines that Powell owes a debt to Caldwell or CPC, Powell is entitled to a setoff because Caldwell allegedly diverted or converted CPC's funds to his own use.  The Court held a trial beginning on November 30, 2017, and concluding on December 8, 2017.[3]  O.C. Rusty Sparks appeared on behalf of the debtors.  Perry Y. Young appeared on behalf of Caldwell and CPC.  At the conclusion of the trial, the Court took the matter under advisement.  For the reasons stated below, the Court finds that Caldwell proved by a preponderance of the evidence that the debtors are not entitled to a discharge pursuant to § 727(a)(4)(A).  Therefore, the Court denies the debtors' chapter 7 discharge.[4]  In addition, the Court finds that Powell owes a debt to Caldwell in the amount of $3393.70 and will enter a separate judgment to that effect.  The Court also finds that Powell owes CPC a balance of $25,690.02 in accordance with the state court's December 10, 2015 judgment.

**Jurisdiction**

The Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).  This order contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy

---

[2]  The complaint also alleged a cause of action under § 727(a)(7).  However, Caldwell's counsel clarified in his opening statement that Caldwell was no longer proceeding under (a)(7).  At the conclusion of the trial, Caldwell's counsel made an oral motion to conform the pleadings to the proof.  Based upon the debtors' lack of objection, the Court granted the motion.

[3]  The trial began on November 30, 2017.  Because the parties were unable to conclude the trial by December 1, 2017, as scheduled, the Court adjourned the trial until December 7, 2017, and it ultimately concluded on December 8, 2017.

[4]  Because the Court denies the debtors' discharge pursuant to § 727(a)(4)(A), the Court need not address Caldwell's causes of action under § 727(a)(2)(A) and § 523(a)(4).

2

Procedure 7052.

## Background

In May 2008, Powell bought a 50% interest in Caldwell's established construction company.[5]  On March 6, 2009, Caldwell and Powell filed amended articles of organization with the Arkansas Secretary of State to change the name of the company from Caldwell Construction, LLC to Caldwell-Powell Construction, LLC.  On May 30, 2010, Caldwell and  Powell executed a partnership agreement [the agreement].[6]  The agreement provided for the formation of a "partnership" under the name of Caldwell-Powell Construction, LLC and stated that Caldwell and Powell each owned a 50% partnership interest. Under the agreement, Caldwell and Powell had equal management rights in CPC unless they agreed otherwise in writing.  The agreement specified that the parties would maintain the partnership's books and records "at the principal office of the Partnership and each Partner shall have access to the books and records at all reasonable times."  The agreement provided that the partnership could be terminated at any time by unanimous agreement of the partners and also outlined a procedure for terminating the partnership in the event that one partner made a unilateral decision to withdraw from the partnership.  In that instance, the agreement provided that the partnership would terminate within 30 days of the date the withdrawing partner notified the other partner of his intention to withdraw unless the remaining partner agreed within that 30-day period to buy the withdrawing partner's interest and continue the partnership.

From mid-2008 to late 2013, CPC bid on and performed commercial and residential construction projects.  CPC was licensed with the Arkansas Contractors Licensing Board, with Caldwell identified as the individual applicant and responsible party.  The parties

---

[5]  At that time, Powell and Caldwell had been friends for more than fifty years.

[6]  Although it is unclear to the Court why Caldwell and Powell adopted a partnership agreement for their LLC, the parties stipulated that the partnership agreement governed their relationship to each other and to CPC.

3

agree that on November 11, 2013, Caldwell notified Powell that he wished to terminate the partnership. Caldwell maintains that Powell agreed that they should part ways while Powell contends that Caldwell made a unilateral decision to dissolve CPC–a business that, by all accounts, had been and continued to be profitable when Caldwell announced his intention to withdraw. On November 14, 2013, Caldwell and Powell discussed winding down the operations of CPC. The parties agreed that CPC would finish two jobs that were already underway. Specifically, they agreed that Powell would finish the Parkview Methodist Church job [Parkview job] and the Benton Birch Leaf Apartments job [Birch Leaf job] and Powell would retain the net profits from those jobs. Powell and Caldwell continued to draw their respective salaries from CPC through the end of 2013.

On November 15, 2013, Powell moved out of his office at CPC's headquarters. Caldwell testified that after Powell departed, he noticed that some of CPC's items were missing, including a new concrete saw that had been sitting in Caldwell's office and a jackhammer and some other items that had been in the warehouse. According to Caldwell, the unexplained disappearance of these items prompted him to lock the filing cabinets where CPC's files and records were kept. Although Caldwell declined Powell's request for a set of keys to the locked filing cabinet, Caldwell says that he told Powell that he was free to access the files during regular business hours under Caldwell's supervision.

In December 2013, Powell sought the advice of attorney John Doyle Nalley [Nalley] regarding the dissolution of CPC. At trial, Nalley recalled that Powell was upset about the breakup of CPC and, in particular, expressed concern about the "joint monies" in CPC's bank accounts at Bank of the Ozarks and Regions Bank. Nalley testified that he advised Powell that "if those are joint monies, where half those monies are yours, and you're worried about these monies are going to go away, you take your half, you secure it, you put it in the bank – if you're worried about it being squandered, you put it in the bank and you don't spend it, because you're going to have to account for it." Trial Tr. vol II, 183-84, Dec. 1, 2017. Although Powell had historically had access to CPC's paper banking records, he had not been privy to CPC's online banking records prior to

4

December 2013.  However, in December 2013, Powell asked Bank of the Ozarks for the password to CPC's operating account and, with his wife's assistance, accessed and began to monitor the account online.  On December 13, 2013, Powell set up an account at Bank of the Ozarks in his own name.  Also on December 13–and without notice to Caldwell–Powell used a temporary check to withdraw $13,100.00 from CPC's operating account at Bank of the Ozarks.  Powell deposited the funds into his new account.  On December 17, 2013, Powell–again without prior notice to Caldwell–used another temporary check to withdraw $25,000.00 from CPC's account.  Powell again deposited the funds into his own account.  Before making the two withdrawals in December 2013, Powell had not previously written checks on CPC's bank accounts or otherwise exercised control over the accounts.  Caldwell first became aware of Powell's withdrawals from CPC's bank account on December 27, 2013, after receiving a notice of insufficient funds from the bank.  When Caldwell attempted to investigate the cause of the insufficient funds by accessing CPC's online bank records, he was denied access to the account as a result of Powell having obtained the password.

On February 25, 2014, Caldwell, individually and on CPC's behalf, sued Powell and Tammy in state court.  Nalley initially represented the Powells in the state court litigation, answering the complaint and filing a counterclaim against Caldwell on Powell's behalf.  On November 12, 2015, Nalley withdrew from his representation of the Powells because they could not continue paying his attorney fees.  Around the same time, Nalley suggested to the Powells that they should consider filing bankruptcy and, to that end, referred them to Jennifer Brooks Wiggins [Wiggins], an attorney with a general practice that, at the time, included bankruptcy.

After Nalley withdrew from the state court case, the Powells failed to respond to a motion for summary judgment filed by Caldwell and CPC.  On December 10, 2015, the state court entered partial summary judgment in favor of CPC, finding that Powell's December 2013 withdrawals from CPC's operating account constituted acts of conversion and were breaches of Powell's fiduciary duties.  The court awarded CPC a

5

judgment against Powell in the amount of $38,100.00.[7]  The state court reserved for subsequent adjudication the issues of specific intent, maliciousness, punitive damages, and CPC's contract claims, as well as Caldwell's individual claims against Powell and both Caldwell's and CPC's claims against Tammy.  After the parties engaged in protracted discovery, the state court scheduled a two-day jury trial for May 10, 2016.

On May 5, 2016, Wiggins filed a skeletal chapter 13 petition on behalf of the debtors, thereby suspending the proceedings in state court.  The debtors' chapter 13 case was dismissed on May 20, 2016, because they failed to timely file schedules and other information.  On June 2, 2016, the state court notified the parties that due to the dismissal of the debtors' bankruptcy case, the court had rescheduled the trial for August 23, 2016. On August 16, 2016, Wiggins filed a skeletal chapter 7 petition on behalf of the debtors, halting the state court litigation for a second time.  On August 17, 2016, this Court entered an Order of Deficiencies, notifying the debtors that they had to file a host of missing documents within the specified time frame or their case would be dismissed. The documents, including the debtors' schedules and statements, were subsequently filed on August 31, 2016.

Caldwell commenced the instant adversary proceeding on November 28, 2016, asking the Court to determine the amount of the debts that he believes Powell owes to him and to CPC; to find that Powell's debts to Caldwell and CPC are nondischargeable under § 523(a)(4); and to deny both debtors' discharges under § 727(a)(2)(A) and (a)(4)(A). On December 29, 2016, the debtors, through their current counsel, Sparks, answered the complaint and filed a counterclaim against Caldwell, denying that Caldwell and CPC are entitled to the relief sought in the complaint and alleging that Caldwell converted or diverted funds and property from CPC to his own benefit, thereby entitling Powell to

---

[7]  The state court also awarded CPC interest in the amount of $4572.00, costs in the amount of $265.00, and a partial award of attorney's fees of $3000.00, for a total judgment against Powell of $45,937.00.

either a judgment against Caldwell or a setoff, depending upon whether the Court finds that Powell owes debts to Caldwell and CPC.  The Court held a trial that began on November 30, 2017, and December 1, 2017.  After a week-long recess, the trial continued on December 7, 2017, and concluded on December 8, 2017.  The parties focused much of their respective efforts at trial toward establishing the dollar amount that each believed the other owed to CPC, with most of the exhibits and much of the testimony presented at trial going to that discrete issue.[8]  However, on the third day of trial, Caldwell and Powell agreed that Caldwell owes $32,222.07 to CPC and Powell owes $65,939.70 to CPC.[9]  Because the Court accepts the parties' stipulation, it need not engage in the mathematical calisthenics that would have otherwise been required to determine the amount of each party's alleged debt to CPC.  In the light of the parties' stipulation, the primary task remaining before the Court is to decide whether the debtors are entitled to their discharge under § 727 and, if the Court finds that they are, to determine whether Powell's debts to CPC and Caldwell are nevertheless nondischargeable under one of the bases alleged by Caldwell pursuant to § 523(a)(4).

At trial, the debtors admitted that their August 31, 2016 schedules and statements–the only schedules and statements that were ever filed in this case–contain inaccuracies,

---

[8]  The parties stipulated to the raw figures embodied in Plaintiffs' Exhibit 38 on the first day of trial but refined their agreement as the trial progressed.

[9]  As a result of the parties' stipulation regarding the amount of their respective debts to CPC, the Court has no occasion to discuss most of the evidence introduced for the purpose of establishing the amount of those debts–with one exception that the Court mentions here because of its negative bearing upon Powell's credibility.  Approximately two months prior to trial, Powell delivered a document to Young's office purporting to show that Powell had incurred expenses of $8229.45 in connection with the Parkview job.  At trial, however, Young introduced evidence that Powell had doctored the document before providing it to Young.  Specifically, Powell had used "white out" to remove references to the Birch Leaf job–the job that had, in actuality, generated the expenses of $8229.45–before adding a handwritten reference to the Parkview job.  Powell admitted that he had altered the document but had no explanation for doing so, saying only that it had been a "mistake."  Trial Tr. vol III, 64-67.

7

omissions, and contradictions.[10]  The debtors contend, however, that they should not be denied a discharge because of the problems with their schedules and statements because their bankruptcy attorney, Wiggins, and her paralegal, Toni Cyr [Cyr], are largely responsible for the mistakes.  According to the debtors' testimony at trial, most of the mistakes on their statements and schedules occurred because: (1) Wiggins and Cyr failed to tell the debtors that they needed to provide them with information about certain assets that had to be disclosed; (2) Wiggins and Cyr failed to put on the debtors' petition, schedules, and statements information that the debtors either provided to them or could have been gleaned from the documents that the debtors gave to them; (3) neither Wiggins nor Cyr provided the debtors with an opportunity to review and sign their petition, schedules, or statements prior to the filing of the documents; (4) Wiggins or Cyr brought the debtors' petition, schedules, and statements to their § 341(a) meeting of creditors and rushed the debtors through the process of signing the documents without affording them a chance to thoroughly review the documents; (5) when the debtors testified under oath at their § 341(a) meeting of creditors that they had read the information contained in their schedules and statements before signing it and that it was true and correct to the best of their knowledge, they had no reason to believe otherwise; and (6) although the debtors were dissatisfied with Wiggins's representation and had discussed firing her and retaining other counsel after they received the Order of Deficiencies at the outset of this case, they claim–without explaining why–that they trusted her.

Although Powell met with Wiggins initially and the debtors had at least one subsequent meeting with Wiggins in addition to seeing her at their § 341(a) meeting, both of the

---

[10]  Powell testified in vague terms that he or Tammy contacted Wiggins or her paralegal, Toni Cyr, to make corrections to the debtors' schedules and statements after being served with Caldwell's adversary proceeding but Powell did not know if Wiggins had made the corrections.  The debtors' current counsel, Sparks, candidly represented to the Court that it is his policy not to file amendments to documents originally filed by another attorney.

debtors testified that they dealt almost exclusively with Cyr, not Wiggins.[11]  Wiggins appeared on the third day of trial and testified that she had practiced bankruptcy law for a period of approximately ten years, filing mostly chapter 7 cases.  According to Wiggins, her normal practice was to use Cyr or another paralegal retained on an contract basis to do "data input" on her chapter 7 cases.[12]  Trial Tr. vol III, 72.  When asked to enumerate Cyr's duties, Wiggins replied:

>     A.    She would typically–I would interview the client, send out an e-mail, copy her on the e-mail, she would gather information, enter data.  We–she would sometimes meet with the client, typically not without my presence or at least me being in the building.  She would come to my office some–most of the time come to my office, meet with a client.  And that was basically it.  I mean, she basically did the data input.
>     Q.    Okay.  Would she ever review documentation with clients?
>     A.    Oh, sure, yeah, but I was typically always–almost always there.
>     Q.    Okay.  What about prepping final filings for your review?
>     A.    Yes, absolutely did that.
>     Q.    Okay.  And what was your process in the preparation and review prior to filing?
>     A.    Well, typically, like I said, a client would come in, I would do an initial interview.  I would send Toni an e-mail with the information and let the client know that they would be contacted by her.  We had a little worksheet that we would have people fill out with a little–a homework assignment, so to speak, with information that we needed, income tax returns, credit report, things of that nature.  Once that information came back to us, it got typically either brought to my office or 99 percent of the time is how that information–additional information came to me was through my office.  And then she would get the information, input it into the computer.  We would go over it most of the time with the client.  And then she–she would upload it along with the certificates.  I would come to the 341(a) meeting.  She would come a lot of times with me and meet me here because she would keep a–the copy of the physical file in her

---

[11]  Despite Cyr being the debtors' primary contact at Wiggins's office, the debtors did not call her as a witness at trial and instead subpoenaed Wiggins.

[12]  It is apparent from the totality of Wiggins's testimony that she authorized Cyr to do more than enter data in regard to the debtors' chapter 7 case.  Also, based on Wiggins's claim that she did not know that Cyr had filed the debtors' earlier chapter 13 case, it is possible that Cyr sometimes acted outside the scope of her agreement with Wiggins.

           possession and then meet me at court and then I would take it from there, because she was doing all the data input, so it made more sense for her to have the physical copy until we got to the 341(a).

---

Q.     Just one file?

A.     One file.

Q.     And primarily supervised and controlled by Ms. Cyr?

A.     Primarily. Like I said, the initial intake was more me. Obviously, the 341(a) meetings with me. Most meetings with clients, I was involved with those as well.

Q.     Now, in the subpoena that I–that I personally served on you, we requested a copy of the physical file?

A.     Right.

Q.     Were you able to bring a copy of the physical file, the bankruptcy Chapter 7 file?

A.     When a case is closed, I typically will scan–or when I'm finished with a case, I'm no longer on the case for whatever reason, I take the–the file, scan it into my computer, and then shred the hard copy. In this case, the physical file was the scanned copy that was on my computer. And it has the–the Chapter 7 petition and the income tax returns for the Powells, their certificates of service were in there, as well–I mean, certificates–their certificates of credit counseling were in there, as well as their debtor education certificates were in there. Also, I put in that file any e-mails that are between us or reaffirmation agreements will go in there. They–in their particular case, there was the Chapter 7 petition, the income tax returns, the certificates, and some reaffirmation agreements, and some–a few e-mails between me and primarily Ms. Powell, some with Toni, of course, and then some e-mails with Judge Phillips' office in Saline County, where the original contract, the original judgment occurred, some e-mails from that. But that was all that was in my file.[13]

Q.     Okay. Now, the physical file that Toni kept, you say once the 341 is completed and everything is done, she gives it back to you, and is that the file that's scanned?

A.     Yes.

Q.     Okay. And that file, I would assume, would include all the preliminary documentation that's been delivered and given to you or given to Toni–

---

[13] Although Wiggins twice told debtors' counsel at trial that "you have what I have" and testified that her file on the debtors included reaffirmation agreements and email correspondence with Tammy Powell, Cyr, and Judge Phillips's office, Defendants' Exhibit 15–which debtors' counsel identified and Wiggins confirmed was a copy of Wiggins's entire file–contained neither reaffirmation agreements nor emails. Trial Tr. vol III, 74-75, 77, 91; Defs.' Ex. 15.

A.      Yes.

Q.      –in preparing the bankruptcy?

A.      Yes.

Q.      Specifically, items such as payroll information?

A.      Yes, that–there was none in this particular case, but, yes, that would typically be in there, paycheck stubs would be in a typical bankruptcy file if that was–

Q.      Now, when you say there's none in this particular case–

A.      Right.

Q.      –you mean there's none in your scanned file?

A.      There's none in my scanned file.

Q.      What about bank account statements?

A.      There's none in my scanned file.

Q.      What about retirement account statements?

A.      There's none in my–the only thing that's in my scanned file is exactly what I just listed.

Trial Tr. vol III, 72-76. Wiggins further testified that she has no documents in her file that were actually signed by the debtors[14]–not even scanned versions of documents bearing their original signatures. Wiggins acknowledged that by filing the debtors' petition, schedules, and statements containing their electronic signatures, she made a representation to the Court as an officer of the court that she had in her possession the same documents bearing the debtors' original signatures. Despite understanding the representation that she was making to the Court, Wiggins testified that Cyr was the one that filed the debtors' documents and that *if* there is a signed petition bearing the debtors' original signatures in this case, Wiggins does not have it. Trial Tr. vol III, 98-99 (emphasis added). Wiggins claimed that it was "very unusual" and contrary to her normal practice for a file to be missing scanned documents containing original signatures. Trial Tr. vol III, 92. When questioned about why her file in the debtors' case had no documents with scanned original signatures, she responded that "I–I don't have an explanation for it. I have no idea. I don't remember anything about that." Trial Tr. vol III, 92. Despite charging the debtors $3000–twice her usual fee for a chapter 7

---

[14] At trial, original signatures were sometimes referred to as "wet copy" or "wet ink" signatures.

case–Wiggins remembered very little about her interactions with the debtors.

**Schedules**

The debtors acknowledge that there are incorrect answers appearing in response to several questions asked of them in their schedules.[15]  Part 4–entitled "Describe Your Financial Assets"–of Schedule A/B inquires about specific categories of financial assets and is prefaced with the question "[d]o you own or have any legal or equitable interests in any of the following?"  Although the debtors admitted at trial that they had $3200 in cash on the date that they filed their petition, they answered "no" to question 16, which required them to disclose any cash that they had on the date of filing.

In response to question 17, which sought information about "deposits of money" and gave examples of "checking, savings, or other financial accounts; certificates of deposit, shares in credit union; brokerage houses; and other similar institutions," the debtors disclosed a personal checking account at Arvest bank with a balance of $600 and a business checking account at Bank of the Ozarks with a balance of $1500.  At trial, however, Powell said that the Arvest account had a balance of $253.13 on the date of the filing of the debtors' petition and admitted that the Bank of Ozarks account had a balance

---

[15]  In addition to the errors and omissions addressed in this section, Young also argued at trial that the debtors should have disclosed the fact that Powell withdrew $10,000.00 in cash from his Bank of the Ozarks account on May 5, 2016.  However, there is no question on the debtors' schedules and statements to which this particular information would have been responsive.  Young further argued that Powell should have disclosed the Hester-Powell project as a joint venture.  However, because the project ended in April 2016, and was not ongoing at the time that the debtors filed their petition, Powell was not required to disclose the joint venture in response to question 19 on Schedule A/B–the only question that specifically inquires about joint ventures.  Young also attempted to show that the debtors' means test was incorrect because the figures used on the means test did not match those reflected on the debtors' 2015 tax returns.  Based on Powell's testimony that there may be problems with the debtors' 2015 tax returns, the Court will not unnecessarily lengthen this opinion by speculating about possible reasons for the alleged discrepancy between the figures on the debtors' means test and those on their 2015 tax returns.

of $5180.37 on that date–making the debtors' combined bank account balances $5308.37 rather than $2100.00 as stated on Schedule A/B.

Despite Powell being the sole member of Powell & Son's Construction and Development, LLC [Powell & Son's] at the time of the debtors' chapter 7 filing, the debtors answered "no" in response to question 19, which asked whether the debtors had any legal or equitable interest in "non-publicly traded stock and interests in incorporated or unincorporated businesses, including an interest in an LLC, partnership, or joint venture." At trial, Powell acknowledged that Powell & Son's should have been disclosed on Schedule A/B. Although he stated that he "would never have answered that intentionally wrong," he downplayed the omission, testifying that "everybody knew I had a business." Trial Tr. vol II, 78. Powell seems to have based his belief that "everyone" knew about Powell & Son's–at least in part–on his initial meeting with Cyr occurring at his "job." Trial Tr. vol II, 114, 130. Wiggins acknowledged that her file contained a copy of the debtors' 2015 federal and state tax returns that included a profit and loss statement for Powell & Son's but had "no idea" why information about the LLC did not appear on the debtors' petition, Schedule A/B, or Statement of Financial Affairs. She hypothesized that perhaps Powell had not had the business at the time of the debtors' chapter 7 filing.

The debtors responded "no" to Question 21, which asked whether the debtors had an interest in "retirement or pension accounts," and cited examples of "interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit sharing plans." In reality, however, Powell had an IRA at Edward Jones with a balance of $14,069.30 and Tammy had a retirement account at Fidelity with a balance of approximately $15,000.00. Powell acknowledged that he had withdrawn $6500.00 from his business account at Bank of the Ozarks and deposited the funds into his Edward Jones IRA account in April 2016–the month before the debtors' chapter 13 case was filed on May 5, 2016, and less than four months before the debtors' filed their current chapter 7 case on August 16, 2016. Trial Tr. vol II, 86. Both debtors testified that they did not

13

provide any information about their respective retirement accounts to Wiggins or Cyr.  At times, Powell accepted blame for the debtors' failure to disclose his Edward Jones account, testifying that he was not trying to hide the account and must have simply "overlooked it."  Trial Tr. vol II, 84.  At other times, Powell blamed Wiggins, testifying that Wiggins never asked him whether he had a retirement account and also–somewhat contradictorily–that "everybody knew" about the account.  Trial Tr. vol II, 131-32, 84.[16]  Although Powell had a counterclaim pending against Caldwell in state court that was scheduled for trial within days of the date that the debtors' chapter 7 petition was filed, the debtors answered "no" in response to question 34, which asked if they had any interest in "other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims."  Wiggins testified that she knew about the state court litigation with Caldwell but said that she did not appear on the debtors' behalf in that matter.  She also testified that before she filed the debtors' case, she alerted Caldwell's counsel–Mr. Young–that the filing was imminent.  Although Wiggins obviously knew that there was litigation pending in state court between Caldwell and the debtors, there is no evidence that the debtors told Wiggins about the counterclaim that Powell had filed against Caldwell and, likewise, there is no evidence that Wiggins inquired.

**Statement of Financial Affairs**

The debtors' SOFA is also incomplete and inaccurate.  Part 2 of the SOFA–entitled "Explain the Sources of Your Income"–asks in question 4 "did you have any income from employment or operating a business during this year or the two previous calendar years?  Fill in the total amount of income you received from all jobs and all businesses, including part-time activities."  In response, the debtors disclosed that Powell was

---

[16]  If neither Powell nor Tammy told Wiggins about the Edward Jones account and, according to Powell, Wiggins never even asked if he had a retirement account, it is unclear what would have led Powell to believe that the existence of the account was common knowledge.  In any event, there is no evidence to suggest that the chapter 7 trustee has ever been made aware of the debtors' respective retirement accounts.

operating a business and listed his gross income from business as $1.00 for the period of "January 1 of the current year until the date you filed for bankruptcy." The debtors disclosed that Tammy had earned gross income of $15,509.33 from "wages, commissions, bonuses, tips" for that same time period. Although Part 2 goes on to ask for the same information–sources of income–for each debtor for the periods of January 1 to December 1, 2015, and January 1 to December 31, 2014, the debtors marked "operating a business" for Powell and "wages, commissions, bonuses, tips" for Tammy but entered "$0.00" for the amounts and stated "will supplement."[17]

Part 8 of the SOFA–entitled "List of Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units"–asks in question 20 "within 1 year before you filed bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?" and specifies that debtors should include "checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, another financial institutions." The debtors marked the box next to "no" in response to question 20. However, Powell had a bank account for a joint venture–the Hester-Powell project–that he did not disclose. Powell testified that the joint venture concluded in April 2016–approximately four months before the debtors filed their chapter 7 petition–and, presumably, Powell closed the bank account when the project ended.[18]

---

[17] There is no evidence that the debtors provided to Wiggins or Cyr tax returns or other documentation necessary to supplement the information on the debtors' SOFA. According to the chapter 7 trustee's notation on the docket in this case, the debtors appeared at their § 341(a) meeting on September 27, 2016, but the trustee continued the meeting to October 11, 2016, because the debtors had not provided their tax returns. On October 3, 2016, the trustee continued the meeting to November 1, 2016, and concluded the meeting on that date.

[18] If the bank account for the Hester-Powell project was still open at the time of the debtors' chapter 7 filing despite the project itself having come to an end, the debtors should have disclosed the existence of the account–and its balance on the date of the debtors' bankruptcy filing–on Schedule A/B. If Powell closed the account prepetition, the debtors should have disclosed the account and its closing balance in their SOFA.

**Section 341(a) Meeting of Creditors**

The debtors testified at trial that they had not seen their schedules and statements prior to the date of their § 341(a) meeting, at which time they met with Wiggins or Cyr in a room across the hall from where the chapter 7 trustee was conducting the meetings.[19] According to the debtors, prior to their § 341(a) meeting, Wiggins or Cyr rushed them through signing the documents, essentially just pointing out where the debtors were to sign. Powell testified that Wiggins did not thoroughly go through every page with him and Tammy. Trial. Tr. vol II, 117-18. At trial, the debtors' attorney asked Powell about the questions that the trustee asked the debtors at the §341(a) meeting:

> Q. At the 341 meeting, in September, did you have any idea that these errors existed?
> A. No, sir.
> Q. At any time after that meeting, before all this blew up, did Ms. Wiggins or Ms. Cyr contact, you call you, write you, and say "Oh, we've discovered some issues we got to fix?" Did that ever happen?
> A. No.
> Q. Was there any reason for you to contact them and say "Oh, I–I've found stuff that's wrong?"
> A. No.
> Q. When you testified at the meeting of creditors and–and the fellow asked you, the Chapter 7 Trustee, "Did you review these schedules?" And you said yes, didn't you?
> A. I sure did.
> Q. Did he ask you when you reviewed these schedules?
> A. No.
> Q. Did he ask you, or do you remember him asking, "Did you review these before they were filed?"
> A. I don't remember that.
> Q. Okay. If your attorney is sitting there beside you, and he asked you that

---

Regardless of where the information about the account should have appeared, the debtors failed to disclose it at all.

[19] Powell initially testified that he and Tammy met with Cyr to sign the documents before their § 341 meeting but then said that he believed that the debtors first met with Wiggins and Cyr appeared at the meeting later. Trial Tr. vol II, 117-18. According to Wiggins, Cyr had the debtors' file until she gave it to Wiggins at the § 341(a) meeting. Wiggins recalled that by the time she got to the debtors' § 341(a) meeting, the debtors and Cyr were already meeting. Trial. Tr. vol III, 84.

> question, and if you don't know that you didn't review those, at that point, would you have thought to say, "Hey, wait a minute, I didn't review any of this before it was filed?"
>
> A.    Right.
>
> Q.    But he probably asked you if you reviewed it before you signed it; does that sound familiar?
>
> A.    Yes.
>
> Q.    And you've testified that Ms. Wiggins or Cyr or both of them sat in that little room across the hall, kind of flipped through this, and said sign here, sign here, sign here, so you did review it, right, of sorts?
>
> A.    Of sorts, yes.
>
> Q.    And you did sign it?
>
> A.    Yes.
>
> Q.    So if he asked you did you review it before you signed it and you said yes, you kind of told the truth, didn't you?
>
> A.    Thought everything was fine.
>
> Q.    You didn't have any reason to believe that there were problems in this, did you?
>
> A.    No, sir.

Trial Tr. vol II, 126-27. Tammy also testified that she did not review the documents at all prior to the time that they were filed. Like Powell, Tammy testified that she did not thoroughly review the documents prior to signing them before the § 341(a) meeting, but that she had no reason to believe that anything was wrong with them. Tammy said that she thought Wiggins knew what she was doing. However, Tammy later testified that she did not have much faith in Wiggins.

Even after the debtors affirmed the veracity of the information contained in their schedules and statements at their § 341(a) meeting, they made no attempt to obtain a copy of the documents to make sure that what Wiggins had filed on their behalf was, in fact, accurate. Nonetheless, the debtors maintained at trial that they were never given a "good opportunity" to review the documents. Both debtors testified that they did not intend to mislead anyone, regardless of the errors and omissions in their schedules and statements. Specifically, Powell testified in response to his attorney's questions:

> Q.    Mr. Powell, I'm going to try to keep this short and sweet. Mr. Young went through a list of omissions and counted them off, I failed to number them, five or six, and he asked you if you admit –and you admitted that

17

documents were filed that had omissions in them, correct?

A.    Right.

Q.    Did you know that at the time the time those documents were filed?

A.    No.

Q.    Would you have allowed those documents to have been filed in that shape when they were filed?

A.    No, sir.

Q.    If you had known that those omissions and things occurred and were evident and available for your knowledge, would you have allowed that to happen?

A.    No, sir.

Q.    Would you have told the Trustee, "Wait a minute, I just looked at this and it's not right?" Would you have done that?

A.    I sure would've.

Trial Tr. vol III, 67-68.

However, Powell also testified in response to Young's questions:

Q.    Did anyone prevent you from reviewing your schedules even after you signed them?

A.    No.

Q.    Your attorney said it was several months ago, perhaps almost a year ago, I'm not sure exactly, that contact was made with Ms. Wiggins to see about making some changes to the petition?

A.    Right.

Q.    It's been a year, sir–in fact, it's been a year and three months since you filed.  Has any change been made to your petition?

A.    Not that I'm aware of.

Q.    Any change been made to your schedules?

A.    Not that I'm aware of.

Q.    Any change been made to your Statement of Financial Affairs?

A.    No.

Trial Tr. vol II, 151-52.  Whether it is because Wiggins failed to amend–or Sparks refused to do so in accordance with his perplexing policy–it is undisputed that the debtors have never filed amended schedules or statements.  As a result, the problems that existed with the debtors schedules and statements on August 31, 2016, persist to this day.

## Findings of Fact and Conclusions of Law

Because the denial of a discharge is a "harsh and drastic penalty," the statute's provisions

are "strictly construed in favor of the debtor." *Korte v. U.S. Internal Revenue Serv*. (*In re Korte*), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (internal citations omitted).  Once a party objecting to a debtor's discharge "establishes a prima facie case, the burden then shifts to the debtor defendant to offer credible evidence to satisfactorily explain his conduct." *Robbins v. Haynes* (*In re Haynes*), 549 B.R. 677, 685 (Bankr. D.S.C. 2016).  However, the objecting party bears the ultimate burden of proving by a preponderance of the evidence that a debtor is not entitled to a discharge.  *In re Korte*, 262 B.R. at 471.

"Bankruptcy provides debtors with a great benefit: the discharge of debts." *Home Serv. Oil Co. v. Cecil* (*In re Cecil*), 542 B.R. 447, 454 (B.A.P. 8th Cir. 2015) (quoting *Ellsworth v. Bauder* (*In re Bauder*), 333 B.R. 828, 834 (B.A.P. 8th Cir. 2005) (Schermer, J., dissenting)).  However, "[t]he price a debtor must pay for that benefit is honesty and candor.  If a debtor does not provide an honest and accurate accounting of assets to the court and creditors, the debtor should not receive a discharge."  *Id.*  The bankruptcy code "requires nothing less than a full and complete disclosure of any and all apparent interests of any kind." *In re Korte*, 262 B.R. at 474 (citation omitted).  When a debtor fails to comply with the code's disclosure and veracity requirements, it "necessarily affects the creditors, the application of the Bankruptcy Code, and the public's respect for the bankruptcy system as well as the judicial system as a whole." *Nat'l Am. Ins. Co. v. Guajardo* (*In re Guajardo*), 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997).  "'A fundamental purpose of § 727(a)(4)(A) is to ensure that dependable information is supplied for those interested in the administration of the bankruptcy estate on which they can rely without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations.'" *In re Haynes*, 549 B.R. at 686 (quoting *Sergent v. Haverland*, (*In re Haverland*), 150 B.R. 768, 770 (Bankr. S.D. Cal. 1993)).  To that end, § 727(a)(4)(A) provides for the denial of a debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  A party objecting to a debtor's discharge under subsection (a)(4)(A) has the burden of proving by a preponderance of the evidence that–

(1) the debtor made a statement under oath;

19

(2) the statement was false;

(3) the statement was made with fraudulent intent;

(4) the debtor knew the statement was false; and

(5) the statement related materially to the debtor's bankruptcy.

*Helena Chem. Co. v. Richmond* (*In re Richmond*), 429 B.R. 263, 307 (Bankr. E.D. Ark. 2010).

The first element under § 727(a)(4)(A) requires that the debtors made a statement under oath. Debtors are required to verify their schedules and statements under the penalty of perjury. *Daniel v. Boyd* (*In re Boyd*), 347 B.R. 349, 354 (Bankr. W.D. Ark. 2006). "Statements made by a debtor in his bankruptcy schedules, his personal statement of financial affairs, and at 341 meetings are all statements made under oath." *Hughes v. Hughes* (*In re Hughes*), 490 B.R. 784, 791 (Bankr. E.D. Tenn. 2013) (citations omitted). Although Wiggins or Cyr subsequently lost the documents that allegedly bear the debtors' actual signatures, the debtors testified that they signed their petition, schedules, and statements before their § 341(a) meeting. The debtors signed those documents under oath. Part 7 of the petition stated: "I have examined this petition, and I declare under the penalty of perjury that the information provided is true and correct." Immediately above the signature lines, the debtors' petition stated: "I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571." The debtors also signed a "Declaration About an Individual Debtor's Schedules" that stated above the signature lines: "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." In addition, Part 12 of the debtors' SOFA stated immediately above the signature lines: "I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C.

20

§§ 152, 1341, 1519, and 3571." In addition to signing their petition, schedules, and statements under penalty of perjury, the debtors also testified at their § 341(a) meeting of creditors under oath, and represented that the information contained in the documents was true and correct. Therefore, the Court finds that the debtors made statements under oath, satisfying the first element of § 727(a)(4)(A).

The second element under § 727(a)(4)(A) requires that a statement that the debtors made under oath was false. The debtors admitted at trial that their schedules and statements contain errors. Specifically, the debtors' schedules and statements understated the debtors' bank balances by a total of $3208.37; omitted $3200.00 in cash that the debtors had on the date that their petition was filed; omitted Powell's Edward Jones IRA worth $15,000.00; omitted Tammy's Fidelity IRA worth $14,000.00; failed to identify Powell & Son's as Powell's source of business income; and failed to disclose the bank account for the Hester-Powell project–an account that Powell had used within the four months prior to the date that the debtors filed their chapter 7 case. In addition, the debtors each testified at their § 341(a) meeting that they had read the information contained in their schedules and statements prior to signing those documents and the information provided was true and correct. However, both debtors admitted that they did not read the documents in any meaningful way before signing them and, as discussed above, the information was neither true nor correct. As a result, the Court finds that the debtors made statements under oath that were false, meeting the second element required under § 727(a)(4)(A).

The third and fourth elements under § 727(a)(4)(A) require that the debtors knew that their statements were false and made them with fraudulent intent. Whether the debtors had the requisite knowledge and intent under § 727(a)(4)(A) is a matter of fact. *Cepelak v. Sears* (*In re Sears*), 246 B.R. 341, 347 (citing *Palatine Nat'l Bank v. Olson* (*In re Olson*), 916 F.2d 481, 484 (8th Cir. 1990)). Fraudulent intent may be "'inferred from the facts and circumstances of the debtor's conduct.'" *In re Korte*, 262 B.R. at 472-73 (quoting *Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 590 (Bankr. D. Minn. 1987)). Even

21

if a debtor is merely careless, the "'cumulative effect of all the falsehoods together evidences a pattern of reckless and cavalier disregard for the truth to support fraudulent intent."' *Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*)*,* 249 F.3d 380, 382-83 (5th Cir. 2001) (quoting *Economy Brick Sales, Inc. v. Gonday* (*In re Gonday*), 27 B.R. 428, 432 (Bankr. M.D. La. 1983)).  Therefore, reckless indifference to the accuracy of the information provided in a debtor's schedules and statements is sufficient to prove intent. *In re Richmond*, 429 B.R. at 298.

At trial, both debtors testified unequivocally that Wiggins did not give them an opportunity to review their petition, schedules, and statements before she–or Cyr, as it turns out–filed them.  Wiggins handled the initial consultation with Powell, met with both debtors once or twice, and made a cameo appearance at the debtors' § 341(a) meeting–but Cyr handled all other aspects of the debtors' case.  Based upon Wiggins's inability to recall meeting with the debtors prior to the filing of their chapter 7 petition or their schedules and statements, the debtors' testimony that it did not happen, and the absence of any evidence suggesting otherwise, the Court finds that the debtors did see their petition, schedules, statements prior to Cyr filing the documents with the Court.  As a result, the Court cannot find by a preponderance of the evidence that the debtors were responsible for the errors and omissions on the date that the documents were filed. However, the Court cannot condone the debtors' subsequent inaction.  Once the debtors became aware that Wiggins or Cyr had filed their petition, schedules, and statements without them having first verified the contents of the documents, the debtors took no action whatsoever to ascertain the accuracy of the documents that had been filed on their behalf.  When the debtors were presented with the documents prior to their § 341(a) meeting, they simply signed them as directed by Wiggins or Cyr.  The record is devoid of any indication that the debtors expressed the slightest interest in verifying the information contained in the documents.  Rather, the debtors admit that they signed the documents after little to no review.

Particularly in the light of the debtors' historical lack of confidence in Wiggins–they had considered firing her only weeks earlier–the Court cannot fathom why the debtors did not ask to see what she had filed on their behalf prior to the date of their § 341(a) meeting, before signing the documents under penalty of perjury, or even after signing them and stating under oath at their § 341(a) meeting that they had read the documents and they were accurate.  The debtors' failure to read their schedules and statements is simply no defense to an action under § 727(a)(4)(A).  *See U.S. Trustee v. Halishak* (*In re Halishak*), 337 B.R. 620, 631-32 (Bankr. N.D. Ohio 2005); *see also Kavanagh v. Leija* (*In re Leija*), 270 B.R. 497, 503 (Bankr. E.D. Cal. 2001).  Further, the debtors' failure to read their schedules and statements before signing them does mean that the debtors did not "know" that their statements were false for purposes of § 727 (a)(4)(A).  In a case with similar facts, another bankruptcy court found that the debtors

> had so little regard for the significance of their actions that they did not even bother to read the questions and their answers, despite the fact that they were signing under the penalty of perjury.  Whether it was rationalization or recklessness, the court does not find that the Debtors' explanations are sufficient for the court to find that they did not know that their answers were false.

*In re Hughes*, 490 B.R. at 792.  "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."  *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 111 (1st Cir. 1987).  Debtors have "an independent duty to provide accurate and complete information whether or not they have been assisted by counsel in preparing their schedules."  *In re Barrows*, 399 B.R. 506, 511 (Bankr. D. Minn. 2009) (citation omitted).

In the instant case, the debtors never even asked Wiggins or Cyr for a copy of the documents that had been filed or tried to obtain a copy from the clerk's office or by other means.  Instead, they opted to blindly rely on Wiggins despite their well-founded reservations about the quality of her representation.  After the debtors learned that Wiggins or Cyr had filed the documents, they had a responsibility to verify the accuracy of the documents as soon as possible–and certainly prior to signing them under penalty of

23

perjury.  They also had a duty to rectify any misrepresentations or omissions as quickly as possible.  *See Bauer v. Iannacone* (*In re Bauer*), 298 B.R. 353, 357  (B.A.P. 8th Cir. 2003) ("The debtor's duty of disclosure requires updating schedules as soon as reasonably practical after he or she becomes aware of any inaccuracies or omissions.") Yet, even after Caldwell filed this adversary proceeding, the debtors made no appreciable effort to correct the inaccurate and incomplete information that was contained in their schedules and statements–other than purportedly placing an ineffectual telephone call to Wiggins.  While counsel for the debtors may be partially to blame for the debtors' failure to amend the error-laden documents that Wiggins initially filed on the debtors' behalf, any shortcomings of the debtors' attorneys do not absolve the debtors of their independent duty to make complete and accurate disclosures in their schedules and statements.  *See Doeling v. Berger* (*In re Berger*), 497 B.R. 47, 66 (Bankr. D.N.D. 2013). Eighteen months after the filing of this case, the debtors have yet to make such disclosures.  Although Caldwell unearthed many of the debtors' misrepresentations during discovery and the trial of this adversary proceeding, neither the debtors' other creditors nor the trustee have ever had the benefit of accurate and full disclosures in this case.  A trustee cannot administer assets of which he is not aware.

Because Wiggins did not afford the debtors a chance to review their schedules and statements prior to Cyr filing them, the debtors may not have *initially* been responsible for at least some of the misrepresentations contained in their schedules and statements.[20] However, the Court finds that the debtors' lack of culpability ended when they signed the documents under penalty of perjury and stated under oath at their § 341(a) meeting that they had read the documents before signing them and then attested to their accuracy. Although Wiggins's patent lack of diligence likely contributed to creating the situation in which the debtors now find themselves, the Court "expects the debtors to take

---

[20]   The record is far from clear regarding what information Wiggins and Cyr asked the debtors to provide to them in preparation for the debtors' chapter 7 filing and is equally murky regarding what the debtors did provide to them.

24

responsibility for reading and understanding what they are representing to the court regarding their past financial transactions and their current assets and liabilities." *In re Hughes*, 490 B.R. at 794. For all of these reasons, the Court finds that the debtors were recklessly indifferent to the accuracy of the statements that they made under oath in their schedules and statements and at their § 341(a) meeting. Therefore, the Court finds that for purposes of § 727(a)(4)(A), the debtors knew that their statements under oath were false and made them with the requisite intent. As a result, the Court finds that the third and fourth elements required under subsection (a)(4)(A) have been satisfied.

Finally, in order to warrant the denial of the debtors' discharge under § 727(a)(4)(A), the debtors' false statements must be material to their bankruptcy case. *In re Richmond*, 429 B.R. at 307. "A false statement is material if it 'bears a relationship to the [debtors'] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of [their] property.'" *Jacoway v. Mathis* (*In re Mathis*), 258 B.R. 726, 736 (Bankr. W.D. Ark. 2000) (quoting *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992)). "The value of omitted assets is relevant to materiality, but materiality will not turn on value." *In re Sears*, 246 B.R. at 347 (citation omitted). "Nondisclosure of an asset of relatively modest value, or a false recitation as to it, can still be considered 'material,' as long as the asset became property of the bankruptcy estate by operation of 11 U.S.C. § 541(a)." *Bernhardt v. Radloff* (*In re Radloff*), 418 B.R. 316, 322 (Bankr. D. Minn. 2009) (citing *Mertz*, 955 F.2d at 598). Here, the debtors understated their bank balances by $3208.37; they failed to disclose $3200.00 in cash; they failed to disclose the identity of Powell & Son's, which was Powell's sole source of income at the time of the debtors' bankruptcy filing; they failed to disclose that Powell had a bank account for the Hester-Powell project that was either still open on the date of the debtors' bankruptcy filing or had been closed only four months prepetition; they failed to disclose Powell's Edward Jones IRA worth $15,000.00; and they failed to disclose Tammy's Fidelity IRA worth $14,000.00. The fact that the debtors may have been able to claim some of these assets as exempt had they disclosed them "does not deprive the omission or false scheduling of materiality." *Id.* (citing *Mertz*, 955 F.2d at 598). The Court finds that all

25

of these false statements were material to the debtors' bankruptcy case, meeting the final element required under § 727(a)(4)(A).

**Conclusion**

For all of the above stated reasons, the Court finds that Caldwell proved each element of § 727(a)(4)(A) by a preponderance of the evidence. Therefore, the Court grants Caldwell's complaint and denies the debtors' discharge. As a result, the Court does not reach Caldwell's allegations under § 727(a)(2)(A) or § 523(a)(4).

The Court also finds that Powell owes damages to Caldwell and CPC as follows. Caldwell:

> According to Plaintiffs' Exhibit 38, Powell retained property valued at $22,256.39 and Caldwell retained property valued at $15,469.00. The combined value of the property retained equals $37,725.39. According to the parties' partnership agreement, Powell and Caldwell each own a 50% interest in the LLC. Hence, each party would be entitled to retain property in the amount of $18,862.70. To equalize the retention, Powell would need to pay Caldwell $3393.70. The Court will enter its judgment against Powell and in favor of Caldwell in that amount.

CPC:

> According to Plaintiffs' Exhibit 38, CPC owes third parties $17,473.45. Exhibit 38 also reflects that Powell retained a net amount of $65,939.70 and Caldwell retained a net amount of $32,222.07. Subtracting from these figures the value of the retained property each party received–$22,256.39 for Powell and $15,469.00 for Caldwell–results in an amended retained net amount of $43,683.31 for Powell and an amended retained net amount of $16,753.07 for Caldwell. This is the amount that each party would owe to CPC to enable CPC to pay its creditors upon dissolution ($17,473.45 according to Exhibit 38). *See* Ark. Code Ann. § 4-32-905 (distribution of assets upon the winding up of an LLC). Crediting $16,753.07

26

toward each of the parties' obligations to CPC results in Powell owing CPC $26,930.24 and Caldwell owing CPC nothing. From this figure Powell is also credited for the Birch Leaf job in the amount of $1239.80, resulting in a remaining debt owed by Powell to CPC in the amount of $25,690.02. Payment of this amount, plus accruing interest, will satisfy the state court judgment that CPC obtained against Powell. After CPC's payment of its creditors, CPC can distribute any remaining funds in accordance with the partnership agreement.

Finally, Caldwell has asked the Court to recognize the dissolution of the LLC under Arkansas Code Annotated § 4-32-901 or judicially dissolve the LLC under Arkansas Code Annotated § 4-32-901. The Court can do neither. Dissolution of an Arkansas LLC under section 901 occurs upon the happening of one of four enumerated events: (1) at a specific time recognized in the articles of organization or an operating agreement, (2) with the written consent of all members, (3) if there are no members, or (4) upon the entry of a judicial dissolution under section 902. Ark. Code Ann. § 4-32-901. None of those events have occurred. Further judicial dissolution under section 902 is reserved for a circuit court within the state of Arkansas "whenever it is not reasonably practicable to carry on the business of the limited liability company in conformity with the operating agreement." Ark. Code Ann. § 4-32-902. Even if the Court found that it is not practicable to carry on CPC's business in conformity with its "partnership" agreement, the Court will not expand the definition of circuit court to include the Federal Bankruptcy Court.

IT IS SO ORDERED.

_Ben Barry_
Ben Barry
United States Bankruptcy Judge
Dated:   02/13/2018

cc:   O.C. Rusty Sparks, attorney for debtors
       Benny and Tammy Powell, debtors
       Perry Y. Young, attorney for Caldwell
       M. Randy Rice, chapter 7 trustee
       United States Trustee

27